**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

TRUE VELOCITY AMMUNITIONS, LLC;
and LONE STAR FUTURE WEAPONS,
INC,

                              *Plaintiffs*,

         v.

SIG SAUER, INC.,

                              *Defendant*.

**CASE NO. _____**

**NOTICE OF REMOVAL**

State Court Case No. 24-CV-01360

## DEFENDANT'S NOTICE OF REMOVAL

Defendant SIG Sauer, Inc. ("SIG Sauer" or "Defendant") hereby gives notice of the removal of the above-captioned action from the Vermont Superior Court, Chittenden Civil Division (Case No. 24-CV-01360) to the United States District Court for the District of Vermont, under 28 U.S.C. §§ 1442(a)(1) and 1446.  As grounds for removal, Defendant states the following:

## PRELIMINARY MATTERS

1.      SIG Sauer makes guns and related products, both for civilian use and for the military.  This case concerns exclusively the latter: crew-served machine guns made under a contract with, and to the exacting specifications of, the United States Armed Forces.  A lawsuit concerning guns made for the U.S. military, tailored to specifications from the U.S. military, pursuant to federal government contracts with the U.S. military, plainly belongs in federal court.

2.      On April 9, 2024, Texas-based companies True Velocity Ammunitions, LLC ("True Velocity") and Lone Star Future Weapons, Inc ("LoneStar") (collectively, "Plaintiffs") filed this action for alleged trade secret misappropriation against New Hampshire-based SIG Sauer

in Vermont Superior Court.  In accordance with 28 U.S.C. §1446(a), true and correct copies of all process, pleadings, and orders that have been filed in state court are attached hereto as **Exhibit A**.

3.     Plaintiffs allege that SIG Sauer misappropriated supposed trade secrets when SIG Sauer built machine guns under a contract with the United States Armed Forces under the federal government's Next Generation Squad Weapons ("NGSW") program.  Plaintiffs bring a single claim under the Vermont Trade Secrets Act, 9 V.S.A. §§ 4601–4609 ("VTSA").  *See* Compl. ¶¶ 54–66.

4.     Plaintiffs brought this time-barred and otherwise meritless case for the improper purpose of gaming the court system to smear SIG Sauer and thereby attempt to gain an improper advantage in the competitive process of bidding for government contracts against SIG Sauer.  Notably, SIG Sauer and Plaintiffs recently delivered competing .338 Norma Magnum ("NM") lightweight medium machine gun ("LMMG") prototypes to the U.S. Military for evaluation and a potential production contract.  Compl. ¶ 60.  Three companies are currently competing for that contract—SIG Sauer, Ohio Ordnance Works, and Plaintiffs[1]—and as the contract is expected to be awarded "in the coming months",[2] the timing of this lawsuit is clearly tied to the competitive bidding process for that contract.  But more importantly for present purposes, Plaintiffs have brought this case in the wrong court.

5.     As explained more fully *infra*, this case is removable under 28 U.S.C. § 1442(a)(1) because the acts of which Plaintiffs complain—SIG Sauer's manufacturing of the machine guns for the federal government's NGSW program—were done as a contractor for, and at the direction

---

[1]   *See* DEFENSE NEWS, *Special operators set to pick light machine gun in new caliber*, https://www.defensenews.com/land/2024/05/08/special-operators-set-to-pick-light-machine-gun-in-new-caliber (May 8, 2024).
[2]   *Id.*

of, the United States Armed Forces, following the strict specifications one would expect of a program to develop crew-served weapons for the U.S. military.

6.     This notice of removal is timely.  Under 28 U.S.C. § 1446(b), removal is timely where notice is filed within 30 days of Plaintiffs' serving SIG Sauer with the Complaint.  SIG Sauer was served with copies of the summons and the Complaint on April 14, 2024.[3]  Accordingly, this notice is timely.

7.     In accordance with 28 U.S.C. § 1446(d), written notice of the filing of this Notice of Removal will be served on Plaintiffs, and a copy of this Notice of Removal will be filed with the Clerk of the Vermont Superior Court, Chittenden Civil Division.

## JURISDICTION AND VENUE

8.     As set forth below, this Court has jurisdiction over this action based on 28 U.S.C. § 1442(a)(1).

9.     Venue is proper in the United States District Court for the District of Vermont given that the state court action was filed in the Vermont Superior Court, Chittenden Civil Division, and Plaintiffs allege that all parties are subject to that court's jurisdiction.

## BACKGROUND

### A.     The Parties

10.     Plaintiffs, who describe themselves as "sister companies," are based in Texas. Compl. ¶¶ 2-4.  LoneStar describes itself as a Delaware corporation, but omits that it conveniently incorporated in Delaware on April 1, 2024, just eight days before filing this lawsuit.  A true and

---

[3]  Peculiarly, Plaintiffs' Affidavit of Service states that service was effectuated on April 12, 2024, while SIG Sauer's registered agent, Cogency Global, Inc., appears to have been served with the Complaint on April 14, 2024.  A true and correct copy of the Notice of Service of Process received by SIG Sauer is attached hereto as **Exhibit B**.  Either way, the filing of this Notice of Removal on May 10, 2024 is timely.

correct copy of LoneStar's State of Delaware Entity Details are attached hereto as **Exhibit C**.  It appears to have done so to destroy complete diversity and allow Plaintiffs to improperly bring their claim in state court.

11.     SIG Sauer is a Delaware corporation based in New Hampshire.[4]

12.     Plaintiffs allege that LoneStar "holds the rights to an extensive intellectual property portfolio, including patents, trademarks, copyrights, and trade secrets related to next-generation military-grade weapons." Compl. ¶ 4.

13.     LoneStar's chairman is Craig Etchegoyen.[5]

14.     Mr. Etchegoyen is, to put it mildly, no stranger to the U.S. court system.  Mr. Etchegoyen has made a fortune by acquiring intellectual property (usually patents) from operating companies and then suing other operating companies for alleged infringement of those patents.  Mr. Etchegoyen was and is the power behind Uniloc and WSOU Investments, two of the most notorious and prolific patent assertion entities (often called patent trolls) in the history of the federal court system.[6]

15.     Mr. Etchegoyen's companies are extraordinarily prolific abusers of the federal court system.  WSOU (literally, "we sue") filed one out of every 20 district court cases in the entire federal court system between March 2020 and March 2021.[7]  They are also strategic: one public article noted that "[r]ather than assert a few related patents against similar accused products or

---

[4]   One might wonder why two Texas-based companies sued a New Hampshire-based company in Vermont state court.  As shown in more detail below, the only plausible explanation is to avoid the statute of limitations under Texas, New Hampshire, or Delaware trade secret law.

[5]   *See* LONESTAR FUTURE WEAPONS, *About LoneStar Future Weapons*, https://www.lonestarfutureweapons.com/about (last visited May 8, 2024).

[6]   *See* UNITED PATENTS, *A Year of WSOU: Craig Etchegoyen's Post-Uniloc NPE Files Nearly 200 Cases*, https://www.unifiedpatents.com/insights/2021/3/18/a-year-of-wsou-craig-etchegoyens-post-uniloc-npe-files-nearly-200-cases (March 19, 2021).

[7]   *Id.*

make any attempt to consolidate or streamline matters for the courts, WSOU instead clogs them, running up court costs and concerns with multiple single-patent cases against a wide variety of different accused products, relying on patents from different families for each defendant."[8]  The goal was to "quietly build up a line of cases to spring on defendants all at once, and use the filing as a sort of ransoming starting point for negotiations once companies are staring down the barrel of millions of dollars in court costs."[9]

16.     In his zeal to exploit other people's inventions to extract value from other people's products, Mr. Etchegoyen often asserted intellectual property to which he did not have rights.  For example, in December 2020, the Northern District of California dismissed Uniloc's lawsuits against Apple, Inc. and others because Uniloc's licensing scheme deprived it of exclusionary rights in the asserted patents and thus of standing to sue.  *See Uniloc USA, Inc. v. Apple, Inc*., 2020 WL 7122617 (N.D. Cal. Dec. 4, 2020).  ZTE Corporation, also sued by WSOU, has moved to dismiss 11 of WSOU's cases against it on similar grounds.[10]

17.     In any event, Mr. Etchegoyen appears to now be applying his "buy intellectual property and sue for infringing it" business model to the machine gun technology at issue in this case.  As discussed below, there is reason to doubt whether LoneStar in fact owns any protectable intellectual property rights, let alone any supposed trade secrets.

**B.     The Alleged "Trade Secrets"**

18.     Plaintiffs spend much of their Complaint asserting that they own certain trade secrets, but rarely if ever get around to explaining what those trade secrets might be, how they are

---

[8]  *Id.*

[9]  *Id.*

[10]   *See* RPX EMPOWER, *Delaware Chief Judge Connolly Pulls Back the Curtain on West Texas Plaintiff with Familiar Ties*, https://insight.rpxcorp.com/news/74088-delaware-chief-judge-connolly-pulls-back-the-curtain-on-west-texas-plaintiff-with-familiar-ties (March 3, 2023).

distinct from information known to the public or to those skilled in the relevant field, or whether Plaintiffs even in fact own them.

19.     The closest Plaintiffs come to explaining what the trade secrets are is in their references to "short recoil impulse averaging."  *See* Compl. ¶¶ 12, 26.

20.     But Plaintiffs do not explain how short recoil impulse averaging could be a trade secret—likely because it cannot.

21.     Short recoil impulse averaging, at least as SIG Sauer understands the term, is simply an application of basic principles of physics,[11] and is a very old technology.[12]  "Impulse average," also sometimes called "firing on runout," means that the shooter fires the gun while the barrel is still moving forward.  This is very old technology, dating to at least World War II, and in any event is suboptimal for gun function in most cases.  "Short-recoil," or "short-stroke recoil," refers to the relatively short distance the barrel moves as compared to that of a long-stroke gun.  The M2 .50 caliber, the flagship heavy machine gun of the U.S. military since World War I, is a short-stroke recoil gun.

22.     Further confirming that the "short-recoil impulse averaging" technology Plaintiffs assert cannot be a trade secret, there are at least two patents (formerly owned by General Dynamics Ordnance and Tactical Systems ("GD-OTS") and now apparently assigned to LoneStar) that include that phrase in the title.  U.S. Patent No. 8,794,121 is entitled "Short Recoil Impulse Averaging Weapon System" and U.S. Patent No. 8,919,238 is called "Weapon System With Short

---

[11]   *See, e.g.*, CLIFFORD NEWTON MILLS, A SHORT COURSE IN ELEMENTARY MECHANICS FOR ENGINEERS (1916) (breaking down the physics and mechanics of recoil and impulse after firing).
[12]   *See, e.g.*, THE BUREAU OF ORDNANCE DEPARTMENT OF THE NAVY, THE MACHINE GUN: DESIGN ANALYSIS OF AUTOMATIC FIRING MECHANISMS AND RELATED COMPONENTS (Volume IV, Parts X and XI, 1955) (providing an in-depth mathematical analysis of short recoil impulse averaging in Chapter Two, titled "Short Recoil").

Recoil Impulse Averaging Operating Group." True and correct copies of U.S. Patent Nos. 8,794,121 and 8,919,238 are attached hereto as **Exhibit D** and **Exhibit E** respectively.

23.     The Complaint is silent on how, if at all, Plaintiffs contend their alleged trade secrets are distinct from the publicly available patented "short recoil impulse averaging technology" or the ways in which that technology has been used for decades.

24.     Plaintiffs also say precious little to support their contention that they own any alleged trade secrets, even if any ever existed. And what little they do say is both unsupported and internally inconsistent.

25.     For example, Plaintiffs allege that LoneStar "holds the rights to an extensive intellectual property portfolio, including patents, trademarks, copyrights, and trade secrets related to next-generation military-grade weapons" that it acquired from GD-OTS. Compl. ¶¶ 4-5. But the assignment agreement from GD-OTS to LoneStar refers only to patents. A true and correct copy of the Patent Assignment Agreement is attached hereto as **Exhibit F**. The Complaint identifies no agreements or any other means by which GD-OTS transferred any alleged trade secrets to LoneStar.

26.     Moreover, Paragraph 4 of the Complaint alleges that LoneStar "holds the rights" to the portfolio at issue, and that True Velocity is merely "licensed to use it." Compl. ¶ 4. But later in the Complaint, Plaintiffs allege that "*Plaintiffs* own . . . trade secret information, including owning by assignment and transfer from GD-OTS, the trade secrets" at issue. *Id.* ¶ 62. In addition, GD-OTS still exists as a global aerospace and defense company,[13] such that GD-OTS clearly did not fully transfer all of its rights to LoneStar.

---

[13]     *See* GENERAL DYNAMICS ORDNANCE AND TACTICAL SYSTEMS, *Our Company*, https://www.gd-ots.com/our-company/ (last visited May 9, 2024).

27.     The Complaint is thus unclear not only as to what the alleged trade secrets are, but also as to who even owns the alleged trade secrets at issue, or whether or when or how that ownership was transferred.  And given Mr. Etchegoyen's companies' history of playing fast and loose with alleged intellectual property ownership and rights (*supra* ¶¶ 14–17), certainly Plaintiffs should not be entitled to the benefit of the doubt.

**C.     SIG Sauer's Development of Machine Guns For the U.S. Armed Forces**

28.     SIG Sauer makes firearms, ammunition, optics, suppressors, and other products generally in the field of firearms technology.

29.     SIG Sauer sells guns and related products both to civilians and to the military and other government entities.

30.     The guns at issue here are machine guns SIG Sauer has developed and sold for the U.S. military.

31.     On May 11, 2017, the federal government issued a Sources Sought Notification ("SSN") asking companies to bid for the opportunity to make belt-fed medium machine guns for the United States Army.  Compl. ¶ 46.

32.     On December 1, 2017, the Department of the Army announced that it was also seeking a "replacement for its lighter belt-fed machine gun, the M249 Squad Automatic Weapon." *Id.* ¶ 47.  This would become the NGSW program.

33.     The federal government provided further details and specifications for this to-be-developed light machine gun with a Prototype Opportunity Notice ("PON") on March 13, 2018.[14] The PON included detailed specifications for the weapon to be produced, including its length,

---

[14]   The March 13, 2018, PON will be provided under seal upon entry of a protective order that has been approved by the United States Department of Defense.

weight (with and without a magazine and other components), dispersion, fire control, rate of fire, suppressor, and controllability.

34.     The military provided companies with a Final Request for Proposals ("RFP") in September 2021.[15]  This document again provided detailed specifications for the lightweight machine gun to be developed, including—as particularly relevant given the nature of the alleged trade secrets at issue here—a specific requirement to mitigate recoil.  The military also provided a "Product Improvement Purchase Description" which included performance requirements that specified a maximum recoil energy and required that the guns be tested for recoil energy and kinematics.[16]  SIG Sauer of course designed its guns to meet those exacting specifications.

35.     In April 2022, the military awarded SIG Sauer the NGSW production contract. Compl. ¶ 58.  The contract would allow SIG Sauer to manufacture and sell SIG Sauer XM250 belt-fed machine guns to the U.S. military.  *Id.*

36.     SIG Sauer has also delivered a medium machine gun proposal to the military, and specifically, Special Operations Command ("SOCOM").[17]  The specification for this project also required that the recoil impulse be sufficiently low as to facilitate effective employment of the gun to its maximum effective range.  SIG of course designed its gun to meet that specification as well.

37.     Thus, each of the guns potentially at issue in this lawsuit, as well as the technology and intellectual property related thereto, were designed and manufactured according to precise specifications provided by the U.S. government for use by the military.

---

[15]   The September 2021 Final RFP will be provided under seal upon entry of a protective order that has been approved by the United States Department of Defense.

[16]   The Product Improvement Purchase Description will be provided under seal upon entry of a protective order that has been approved by the United States Department of Defense.

[17]   The SOCOM Development Document for the Lightweight Medium Machine Gun will be provided under seal upon entry of a protective order that has been approved by the United States Department of Defense.

D.     **The Events Leading To This Lawsuit**

38.     David Steimke was formerly a General Dynamics ("GD") employee.  In 2013, GD shifted some employees, including Mr. Steimke, from its Armament and Technical Products (ATP) division to its Ordnance and Tactical Systems (OTS) division,[18] eventually leading to a demotion and pay cut for Mr. Steimke.  As a result, Mr. Steimke started looking for a new job in late 2013, and in January 2014, Mr. Steimke started working for SIG Sauer.  Mr. Steimke had worked generally in machine gun technology at GD.  For his first few years at SIG Sauer, Mr. Steimke worked on a 9mm submachine gun; he did not begin designing machine guns for SIG Sauer until about 2017.

39.     In December 2013, SIG Sauer hired Jason Knight.  Mr. Knight had also previously worked at GD before being laid off in a series of GD layoffs.  Mr. Knight had worked on machine guns at GD.  For his first few years at SIG Sauer, Mr. Knight worked on various non-machine gun-related projects, only working on the machine gun program from 2017-2020.  Mr. Knight left SIG Sauer in 2020 and now works for the U.S. Air Force as a systems engineer.

40.     In February 2017, SIG Sauer hired Paul Snyder.  Mr. Snyder had worked at GD from August 2001-September 2013 before being laid off in a series of GD layoffs.  He worked on field testing of machine guns at SIG Sauer before leaving for Raytheon in August 2020.

41.     This entirely innocuous series of events—SIG Sauer hiring three individuals who had previously worked at GD (and who were not "aggressively recruit[ed]" by SIG Sauer but were rather laid off or demoted by GD, one with a four-year gap between his time at GD and his time

---

[18]   *See* GENERAL DYNAMICS, *General Dynamics to Consolidate Two Combat Systems Businesses*, https://www.gd.com/Articles/2013/07/15/general-dynamics-consolidate-two-combat-systems-businesses (July 15, 2013).

at SIG Sauer)—seems to form much of the basis of the speculation on which Plaintiffs' Complaint is based. *See, e.g.*, Compl. ¶ 13.

42.     Plaintiffs allege that, on January 19, 2019, GD-OTS employees "attended the International Special Operations Forces (ISOF) Range Day." Compl. ¶ 49. Plaintiffs further allege that some of those unnamed employees saw a SIG Sauer machine gun operate and "noted that it appeared to utilize the substantially same [short recoil impulse averaging] technology developed at GD-OTS." *Id.* Plaintiffs do not say what about the SIG Sauer gun seemed to use "the substantially same" technology, or how the unnamed GD-OTS employees could reach that conclusion simply by observing the gun in action (from what can only be presumed to be a safe distance away).

43.     Nonetheless, in May 2019, GD-OTS sent SIG Sauer a letter asking whether GD-OTS proprietary information was used in the development of SIG Sauer's gun. In July 2019, SIG Sauer responded and explained that it had not used any GD-OTS proprietary or confidential information to develop any SIG Sauer weapon.[19] GD-OTS, seemingly satisfied by SIG Sauer's response, dropped the issue.

44.     SIG Sauer thought that its letter denying use of any of GD-OTS's proprietary information and GD-OTS's failure to pursue it further, five years ago, was the end of it. But on April 14, 2024—not coincidentally, the day before the NGSW New Equipment Training event at Fort Campbell, Kentucky, in which military personnel were testing SIG Sauer NGSW weapons to

---

[19]   Thus, GD-OTS (and its supposed successors in interest in part, Plaintiffs) knew of the alleged misappropriation by no later than January 2019. The Texas, New Hampshire, and Delaware trade secret laws both provide three-year statutes of limitations. In any of those states—the states where the parties are based and/or incorporated—Plaintiffs' claims would thus be plainly time-barred. Vermont's six-year bar appears to explain the otherwise bizarre decision for two Texas-based companies to sue a New Hampshire-based company in state court in Vermont.

determine their functionality/suitability for combat[20]—it was served with this lawsuit.  Per an Army Times story, the consensus from the military personnel at the event was that the SIG Sauer NGSW weapons exceeded expectations.[21]  It was known to SIG Sauer, and presumably Plaintiffs, that this event was happening and that there would be a media presence at the event.  Another story was released in the Military Times the same day as the Army Times story that focuses on this lawsuit and includes a related quote from Pat Hogan, a True Velocity spokesperson.[22]

45.     Plaintiffs never contacted SIG Sauer before filing suit.  There was no letter, email, or phone call to inquire about the supposed misuse of the alleged trade secrets.  But they did run to the Military Times to seemingly plant the above-referenced story smearing SIG Sauer.[23]

46.     Plaintiffs' conduct reveals their true motive: to attempt to publicly sully SIG Sauer's name and, through its meritless claims, unfairly compete with and try to boost their chances against SIG Sauer for government contracts, specifically, the pending (and soon to be awarded) .338 NM LMMG production contract.  SIG Sauer will vigorously defend itself against Plaintiffs' meritless allegations.  But for the instant purpose, the most important point is that Plaintiffs' claims about technology relating to federal government contracts should be heard in federal court.

---

[20]   *See* Todd South, *Next Generation Squad Weapon and optic exceed soldiers' expectations*, ARMY TIMES, https://www.armytimes.com/news/your-army/2024/04/17/new-rifle-automatic-rifle-and-optic-exceed-paratrooper-expectations (April 17, 2024).
[21]   *Id.*
[22]   *See* Jen Judson, *True Velocity sues Sig Sauer, alleging stolen trade secrets*, MILITARY TIMES, https://www.militarytimes.com/land/2024/04/17/true-velocity-sues-sig-sauer-alleging-stolen-trade-secrets (April 17, 2024).
[23]   *Id.*

## **GROUNDS FOR REMOVAL**

47.     The federal officer removal statute permits any federal officer or "any person acting under that officer," including a federal contractor, who is sued "for or relating to any act under color of such office" to remove the case to federal court. 28 U.S.C. § 1442(a)(1).

48.     The federal officer removal statute is to be "liberally construed," *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007) (citation omitted), and "should not be frustrated by a narrow, grudging interpretation." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).  The statute exists so that suits against federal officers and contractors can "be removed despite the nonfederal cast of the complaint," *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999), and reflects a congressional policy that both federal officers and contractors working under those officers "require the protection of a federal forum," *Willingham*, 395 U.S. at 407.  Indeed, the federal officer removal statute's "basic purpose" is to "protect the Federal Government from the interference with its 'operations' that would ensue were a State" able to bring "officers and agents of the Federal Government 'acting within the scope of their authority'" into "trial in a State court" based on those acts.  *Watson*, 551 U.S. at 142.

49.     It would be hard to think of a case that more forcefully implicates the policy concerns underlying the federal officer removal statue than this one, in which Plaintiffs ask a ***state court*** for an ***injunction*** preventing SIG Sauer from making critical weapons ***for the U.S. military***.

50.     Not only "must the words of § 1442 be construed broadly but a court also must 'credit [the d]efendants' theory of the case' when evaluating the relationship between the defendants' actions and the federal officer."  *Agyin v. Razmzan*, 986 F.3d 168, 175 (2d Cir. 2021) (quoting *Jefferson County*, 537 U.S. at 432).

51.     Removal under the federal officer removal statute is thus proper when a removing party shows that "(1) the defendant is a 'person' under the statute, (2) the defendant acted 'under

color of federal office,' and (3) the defendant has a 'colorable federal defense.'" *Agyin*, 986 F.3d at 174.  The Second Circuit has held that this statute "must be liberally construed" in favor of the federal forum.  *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 136 (2d Cir. 2008).

52.     Each required condition for removal is met here.

**A.     SIG Sauer Is A "Person" Under The Federal Officer Removal Statute**

53.     It is undisputed that SIG Sauer, a corporation, is a "person" within the meaning of Section 1442(a)(1).  *See Isaacson*, 517 F.3d at 136 (citing cases permitting corporations acting as federal contractors to remove cases to federal court under the federal officer removal statute and holding that, in §1442, "the term 'person' includes corporate persons").

**B.     SIG Sauer Acted Under Color Of Federal Office**

54.     At all relevant times during the alleged misappropriation, SIG Sauer was "acting under" a federal officer or agency.  *See* 28 U.S.C. § 1442(a)(1).  A private party "act[s] under" the government where the government exerts some "subjection, guidance, or control" beyond mere compliance with the law.  *Watson*, 551 U.S. at 151 (citation omitted).  The central question is whether the private entity is helping a federal officer "fulfill other basic governmental tasks" that "in the absence of a contract with a private firm, the Government itself would have had to perform." *Id.* at 153–54; *see also Agyin*, 986 F.3d at 175 ("Congress used the words 'acting under' to describe 'the triggering relationship between a private entity and a federal officer' . . . That relationship involves 'an effort to assist, or to help carry out, the duties or tasks of the federal superior.'").

55.     Courts broadly construe § 1442, particularly where private corporations are "acting under" a federal officer.  *Watson*, 551 U.S. at 147.  As specifically relevant here, "courts have unhesitatingly treated the 'acting under' requirement as satisfied ***where a contractor seeks to***

*remove a case [with claims] arising from equipment that it manufactured for the government*."

*Agyin*, 986 F.3d at 175 (emphasis added). This element need not be strictly plead; rather, a mere "allegation that petitioners were [] acting under color of office [is] sufficient . . . It is enough 'if the court is provided the facts from which its jurisdiction can be determined'." *See id.* at 181.

56.     This case is about as textbook as it gets for federal officer removal: manufacturing machine guns for the military, based on specifications provided by the military, is a quintessential example of a task that, "in the absence of a contract with a private firm, the Government itself would have had to perform." *Watson*, 551 U.S. at 153-54. Here, the federal government (specifically, the U.S. Armed Forces) used SIG Sauer to achieve an end it would otherwise need to use its own employees to complete—*i.e.*, the development of machine guns for the United States Army's NGSW program. Compl. ¶ 58; *see also supra* ¶¶ 32–37. Moreover, Plaintiffs' own allegations make clear that the machine gun manufacturing work that forms the basis of Plaintiffs' trade secret misappropriation claim was at the direction of the United States government.

57.     For example, Plaintiffs allege that, on May 11, 2017, the federal government put out a notice that it was seeking a specific type of belt-fed machine gun for the United States Army. *See* Compl. ¶ 46 ("[T]he U.S. Government published a Sources Sought Notification (SSN). An SSN is typically a precursor to a Contract Opportunity. The SSN sought sources to provide 5000 .338 NM belt-fed medium machine guns."). Then, Plaintiffs allege that, on December 1, 2017, the "Department of the Army" announced that it was also seeking a "replacement for its lighter belt-fed machine gun, the M249 Squad Automatic Weapon." *Id.* ¶ 47. The federal government proceeded to lay out the details and specifications it required in this automatic weapon with a Prototype Opportunity Notice ("PON") on March 13, 2018, for a program that ultimately became the Army's NGSW program. *Id.*

58.     Plaintiffs further allege that, over a period of several years, SIG Sauer and five other manufacturers[24] competed for the NGSW contract.  *Id.* ¶ 55.   After working with each manufacturer on prototypes, the "Army selected three manufacturers" in September 2019 (SIG Sauer, GD-OTS, and AAI Corp Textron).  *Id.*  In April 2022, after a period of development that spanned approximately five years, "SIG was awarded the NGSW production contract . . . to manufacture and sell SIG XM250 belt-fed machine guns to the U.S. government."  *Id.* ¶ 58.

59.     At all relevant times, SIG Sauer developed machine guns for the NGSW opportunity and following the precise requirements—including specifications related to recoil mitigation, accuracy, barrel performance, and suppression—provided to it by the United States Army in the PON.  *See supra* ¶¶ 32–37.

60.     Such allegations satisfy the "acting under" standard needed for removal under Section 1442(a)(1).  Removal is appropriate in cases "involv[ing] defendants working hand-in-hand with the federal government to achieve a task that furthers an end of the federal government," and a case where a contractor fulfills a contract with the federal government fits easily within that standard.  *Agyin*, 986 F.3d at 176–7.  There is no dispute that SIG Sauer worked hand-in-hand with the federal government to achieve a task that furthers an end of the federal government—indeed,

---

[24]   Neither True Velocity nor Lone Star were amongst those competing for the NGSW contract. *See* Compl. ¶ 55.

the development and manufacturing of machine guns for the U.S. military is a quintessential federal government purpose.[25]

**C.   SIG Sauer Has Colorable Federal Defenses**

61.   SIG Sauer will raise multiple "colorable federal defenses" as required for removal under Section 1442(a)(1).  At this stage of the proceedings, SIG Sauer need not prove that it will ultimately prevail on any specific defense, only that the defense is "colorable."  *Isaacson*, 517 F.3d at 138–9.  "Courts have imposed few limitations on what qualifies as a colorable federal defense," and the "requirement is satisfied in 'all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law' . . . [T]he defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court."  *Id.* (quoting *Mesa v. California*, 489 U.S. 121, 129–30 (1989)).

*The Federal Government Contractor Defense*

62.   First, SIG Sauer will advance the government contractor defense under federal common law.  The federal government contractor defense applies when (1) the United States approved reasonably precise specifications; (2) the contractor's work product conformed to those specifications; and (3) the supplier warned the United States about the risks or exposures in the use of the equipment known to the supplier but not to the United States.  *Boyle v. United Techs.*

---

[25]   The "acting under" standard does not require a contractor to be "under the direct and detailed control of a federal agency or officer." *Agyin*, 986 F.3d at 177.  But even if it did, SIG Sauer would meet that test.  A subcontractor that is "expected to follow [the federal government's] policies and procedures," which "impose[d] requirements" that the subcontractor could not refuse and over which "the federal government retained discretion," acts under the direct and detailed control of the federal government. *See id.*  Yet again this case is a pristine example: the United States military unsurprisingly has detailed specifications, policies, and procedures governing the manufacture of weapons, and retains exclusive discretion over those policies. SIG Sauer manufactured the guns at issue in this lawsuit in strict compliance with those policies.

*Corp.*, 487 U.S. 500, 512 (1988).  The defense protects government contractors from state tort liability that may befall them should they carry out a federal contract.  *Id.*

63.     The government contractor defense provides federal courts with jurisdiction over cases where the federal government played a role in directing the alleged conduct at issue, with knowledge of the facts at the core of the claim.  *See, e.g.*, *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 91–92 (2d Cir. 2008).  The defense applies when the "government remains the 'agent of decision'" and "independently and meaningfully reviews the specifications," such that the "design ultimately selected may well reflect a significant policy judgment by [g]overnment officials."  Again, there could scarcely be a clearer example of a case where this defense would apply: no one can seriously dispute that the government is "the agent of decision" and "independently and meaningfully reviews the specifications" for the machine guns provided to the military, or that the design of those guns must necessarily "reflect a significant policy judgment by [g]overnment officials."

64.     As the Supreme Court has recognized when explaining the purpose of this defense, the "obligations to and rights of the United States under its contracts are governed exclusively by federal law," and "the liability of independent contractors performing work for the Federal Government, like the liability of federal officials, is an area of uniquely federal interest," potentially "warranting the displacement of state law."  *Boyle*, 487 U.S. at 504-505 & n.1; *see also In re Agent Orange*, 517 F.3d at 87 (noting that the "'uniquely federal interest[]' of 'getting the Government's work done'" can mandate that "independent contractors be protected from tort liability associated with their performance of government procurement contracts").

65.     Here, the claims at issue squarely implicate the government contractor defense.  As explained above, the Complaint alleges that SIG Sauer provided deliverables to the federal

government pursuant to proposals that the federal government provided and approved.  *See, e.g.*, Compl. ¶¶ 46–47, 55, 58.  The Complaint similarly alleges that SIG Sauer delivered the technology at issue to the government as a contractor for a specific project—the NGSW project— demonstrating that the technology conformed with the government's approved specifications.  *Id.* Plaintiffs allege that the technology at issue was supplied to the federal government by SIG Sauer pursuant to the SSN and PON process requiring manufacturers to compete for a contract to manufacture machine guns which included detailed technical specifications.  *See id.*

66.    On these facts, Plaintiffs' allegations regarding the underlying government contracts and technology at issue squarely implicate the government contractor defense.  *American Systems Consulting, Inc. v. Devier*, 514 F. Supp. 2d 1001 (S.D. Ohio 2007), is instructive.  There, the plaintiff brought claims for, *inter alia*, misappropriation of trade secrets under state law.  *See id.* at 1004.  The plaintiff alleged that the individual defendants, who were former employees of the plaintiff, had misappropriated its confidential information upon joining a rival company.  *See id.*  Both the plaintiff and that rival company provided services to the Defense Commissary Agency.  *See id.*  One defendant removed the case to federal court under Section 1442(a)(1).  *See id.*  In denying the plaintiff's motion to remand the case to state court, the court in *American Systems* determined that removal of the entire case was appropriate under Section 1442(a)(1), because (1) one of the individual defendants had indicated that his work for the company was under the direction of a government official, (2) that defendant was "asserting defenses predicated on th[at] fact, and [(3)] there was a causal nexus between the defendant's alleged work for the government and "the allegations of [trade secret misappropriation in the] pleading."  *Id.* at 1008; *see also id.* at 1009 ("If a government official direct[ed] [one defendant] to perform work that implicates impermissible reliance on trade secrets or other confidential information so as to permit

[that defendant] to invoke § 1442(a)(1), then [the other defendant] follows him to this federal forum."); *C.R. Pittman Const. Co. Inc. v. Parson & Sanderson, Inc.*, No. CIV.A. 10-1027, 2010 WL 3418240, at *2 (E.D. La. Aug. 24, 2010) (in action for, *inter alia*, breach of contract, removal was appropriate where the defendant "presented a colorable defense by identifying specific contract specifications and conditions which show that governmental approval was required for [d]efendant's submissions and that it complied with the specifications").

### Application Of Federal Law

67.     Removal is further appropriate because the claims and issues in this action turn on the application of federal law, including the scope and force of federal statutes and regulations. Under the federal officer removal statute, "suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is met *if the defense depends on federal law*." *Jefferson County*, 537 U.S. at 431.

68.     Plaintiffs' claims center on information and technology that Plaintiffs (or their predecessor in interest, GD-OTS) shared with federal agencies, and to which the federal government may have received unlimited rights, under contracts entered into under federal law and governed by federal regulations.  The application of those federal laws and regulations to the facts of this dispute is fatal to Plaintiffs' claims, and SIG Sauer's defenses based on these federal laws and regulations more than "colorably" undermine Plaintiffs' claim that the information and technology at issue qualify as Plaintiffs' trade secrets.

69.     Specifically, Plaintiffs' assertions—and SIG Sauer's related defenses—turn in part on whether, and to what extent, federal regulations gave the federal government rights in the technology at issue.  *See, e.g.*, Compl. ¶¶ 54-60 (alleging that GD-OTS was awarded a contract to compete in the United States Army's NGSW program, worked on the design and manufacturing

of a lightweight medium machine gun with the United States Army over the course of several years, and provided its LMMG to the United States Army to ultimately become one of two manufacturers remaining in the competition for the NGSW contract).   Whether Plaintiffs sufficiently protected the alleged trade secrets at issue—as required under the VTSA—will turn on whether, and to what extent, the federal government was restricted from using, modifying, reproducing, or disclosing the technology at issue—an issue again controlled by federal statutes and regulations.

70.   Finally, to the extent there are disputes between the parties about the interplay (and potential conflict) between these federal statutes and Plaintiffs' state law claims, and where resolution of that conflict may determine the scope of federal rights in the technology at issue in this case, those disputes should be considered in federal court, as anticipated by Section 1442(a)(1) and the broad manner in which courts construe that statute.

71.   Accordingly, for these reasons, removal of this case is proper under 28 U.S.C. § 1442(a)(1).

GRAVEL & SHEA PC


*Matthew B. Byrne*
Matthew B. Byrne, Esq.
76 St. Paul Street, 7th Floor, P.O. Box 369
Burlington, VT  05402-0369
(802) 658-0220
mbyrne@gravelshea.com

OF COUNSEL:

David M. Orta (*pro hac forthcoming*)          *Attorneys for Defendant*
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
(202) 538-8000

Patrick D. Curran (*pro hac forthcoming*)
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, MA  02199
(617) 712-7100

James D. Judah (*pro hac forthcoming*)
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600

May 10, 2024

## <u>CERTIFICATE OF SERVICE</u>

I, Matthew B. Byrne, Esq., hereby certify that on May 10, 2024, I caused the foregoing document to be electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.  I hereby certify that I have served the foregoing by electronic mail and Federal Express to counsel for Plaintiffs in *True Velocity et al. v. SIG Sauer, Inc.* No. 24-CV-01360 (Vt. Sup. Ct, Chittenden Civil Unit) at the following address:

Alison J. Bell
LANGROCK SPERRY & WOOL, LLP
210 College Street, Suite 400
Burlington, VT 05401
abell@langrock.com

Greg Love
STECKLER WAYNE LOVE, PLLC
107 East Main Street
Henderson, TX 75652
greg@stecklerlaw.com

Kaitlyn Coker
STECKLER WAYNE LOVE, PLLC
12720 Hillcrest Road
Dallas, TX 75230
kaitlyn@stecklerlaw.com

*Matthew B. Byrne*
Matthew B. Byrne, Esq.
76 St. Paul Street, 7th Floor, P.O. Box 369
Burlington, VT  05402-0369
(802) 658-0220
mbyrne@gravelshea.com