UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

TRUE VELOCITY AMMUNITIONS,      )
LLC and LONE STAR FUTURE        )
WEAPONS, INC.,                  )
                                )
        Plaintiffs,             )
                                )
            v.                  )      Case No. 2:24-cv-522
                                )
SIG SAUER, INC.,                )
                                )
        Defendant.              )

## OPINION AND ORDER

Plaintiffs True Velocity Ammunitions, LLC ("True Velocity")
and Lone Star Future Weapons, Inc. ("Lone Star") bring this
action claiming trade secrets misappropriation in violation of
the Vermont Trade Secrets Act ("VTSA"), 9 V.S.A. § 4601, *et seq.*
Plaintiffs initiated the case in state court and Defendant SIG
Sauer, Inc. ("SIG Sauer") subsequently removed it to federal
court.  Pending before the Court is SIG Sauer's motion to
dismiss in which it argues lack of standing, lack of personal
jurisdiction, improper venue, and failure to state a claim.  ECF
No. 5.  Also before the Court is Plaintiffs' motion to remand to
state court.  ECF No. 16.  For reasons set forth below, the
pending motions are **denied.**

## Background

According to the Complaint, Plaintiffs and SIG Sauer
directly compete to provide the United States Armed Forces and

their allies with weapons.  True Velocity is a Texas corporation with an address in Garland, Texas.  Lone Star is a Delaware corporation, also with an address in Garland, Texas.  The two are reportedly sister companies.  SIG Sauer is a Delaware corporation based in New Hampshire.

Lone Star allegedly holds the rights to an intellectual property portfolio related to military-grade weapons.  True Velocity manufactures ammunition and weapons, including light and medium machine guns for military applications, and is licensed to use Lone Star's intellectual property.  General Dynamics, which is not a party in this case, is Lone Star's predecessor in interest with respect to certain intellectual property.

General Dynamics is a global aerospace and defense company specializing in design, engineering, and manufacturing.  General Dynamics Ordnance and Tactical Systems ("GD-OTS") is a wholly owned subsidiary of General Dynamics.  GD-OTS operates design and engineering facilities in Williston, Vermont, employing over 450 people.  It also operates a site at the Ethan Allen Firing Range in Jericho, Vermont.  GD-OTS's operations in Vermont include engineering, design, testing and evaluation of armament systems.

As a result of research and development efforts at its Vermont facilities beginning in 2009, GD-OTS allegedly developed

certain trade secrets related to machine guns.  GD-OTS
specifically developed a Lightweight Medium Machine Gun ("LMMG")
featuring a recoil mitigation system called Short Recoil Impulse
Averaging ("SRIA").  SRIA reduces recoil without increasing the
weapon's mass or receiver length, resulting in a lightweight
weapon with heavy machine gun capability.  The Complaint alleges
that GD-OTS refined the design of the LMMG over a period of
several years.

Plaintiffs claim that SIG Sauer improperly misappropriated
LMMG and SRIA trade secrets by recruiting GD-OTS employees.
Those efforts allegedly began in 2014 and have continued since
that time.  The Notice of Removal asserts that those employees
were not actively recruited away from GD-OTS, and instead came
to work for SIG Sauer after demotions or layoffs impacted their
employment at General Dynamics.

SIG Sauer also submits that Plaintiffs' pleadings do not
provide specifics with respect to any alleged trade secrets.
SIG Sauer argues that SRIA is a "very old technology" in
operation, at least in part, since at least World War II.  SIG
Sauer further notes that there are publicly available patents
with "Short Recoil Impulse Averaging" in the title.

On May 11, 2017, the U.S. government issued a Sources
Sought Notification ("SSN") asking companies to bid for the
chance to make belt-fed medium machine guns for the Army.  On

December 1, 2017, the Army announced that it was seeking a
replacement for its lighter belt-fed machine gun.  This
announcement was followed by a Prototype Opportunity Notice
("PON") on March 13, 2018, for what would come to be known as
the Next Generation Squad Weapons ("NGSW") program.

In October 2018, SIG Sauer allegedly debuted a direct
competitor to the GD-OTS LMMG.  The Complaint alleges that prior
to that time, no company other than GD-OTS had produced a
lightweight medium machine gun that met the Army's
specifications.  In January 2019, GD-OTS employees attended a
demonstration of SIG Sauer's weapon and reportedly "noted that
it appeared to utilize the substantially same SRIA technology
developed at GD-OTS."  ECF No. 10 at 13, ¶ 49.  The Complaint
further alleges that SIG Sauer has developed a series of belt-
fed machine guns that "were designed and/or incorporated a
substantial degree of Plaintiffs' impulse averaging and LMMG
trade secrets."  *Id.* at 10, ¶ 53.

In 2021, GD-OTS and Plaintiffs allegedly entered into a
Teaming Agreement whereby Plaintiffs received GD-OTS LMMG
technical data and marketing materials and took over further
design activities.  SIG Sauer contests the allegation that
Plaintiffs were assigned any trade secrets by GD-OTS, noting
that the assignment agreement from GD-OTS to Lone Star refers
only to patents.

In April 2022, the Army awarded SIG Sauer the NGSW production contract. The value of that contract was $4.5 billion. The Complaint alleges that True Velocity and SIG Sauer recently delivered competing machine gun prototype weapons to the U.S. Military for evaluation and a potential production contract. Plaintiffs again claim, "based on information and belief, [that] SIG Sauer's submission incorporates a substantial degree of Plaintiffs' impulse averaging and LMMG trade secrets." *Id.* at 15, ¶ 60. The sole cause of action in the Complaint is brought pursuant to the Vermont Trade Secrets Act, 9 V.S.A. § 4601, *et seq.*[1]

Now before the Court are two motions: SIG Sauer's motion to dismiss and Plaintiffs' motion to remand. SIG Sauer's motion denies that the information at issue constitutes trade secrets and argues that, even assuming trade secrets, the Complaint fails to allege Plaintiffs own those secrets. SIG Sauer therefore contends that Plaintiffs lack standing to bring a claim of trade secret misappropriation. SIG Sauer also contends that hiring people who used to work in Vermont does not create personal jurisdiction, that venue is improper, and that the Complaint should be dismissed for failure to plausibly allege

---

[1] The Complaint seeks damages and injunctive relief. At oral argument on the pending motions, Plaintiffs' counsel informed the Court that Plaintiffs will not be pursuing injunctive relief.

either a protectable trade secret or unlawful misappropriation. The motion to remand contends that SIG Sauer fails to meet the requirements for federal officer removal.

## Discussion

### I.   Motion to Remand

"[F]ederal courts are courts of limited jurisdiction," and "may not exercise jurisdiction absent a statutory basis." *Home Depot U.S.A., Inc. v. Jackson*, 587 U.S. 435, 437 (2019) (citations omitted).  The Court will therefore first address whether it has jurisdiction to adjudicate this case and, relatedly, whether the matter must be remanded to state court. The party asserting jurisdiction bears the burden of proving that the case is properly in federal court. *Yong Qin Luo v. Mikel*, 625 F.3d 772, 775 (2d Cir. 2010).

SIG Sauer filed its Notice of Removal pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which provides that a case may be removed to federal court when it is brought against "the United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1)).  The Second Circuit has held that "[w]hile the general removal statute must be strictly construed, both § 1442 and especially its 'acting under'

6

provision must be read broadly." *Agyin v. Razmzan*, 986 F.3d 168, 175 (2d Cir. 2021) (citations omitted).  Indeed, "[c]ourts generally apply a broad construction — particularly with respect to private parties who claim to be 'acting under' a federal officer." *Id.*  "The Supreme Court has said, for example, that a private company acting pursuant to a contract with the federal government has this relationship." *Id.*

Because SIG Sauer is a private party, it "must satisfy a three-pronged test to determine whether [it] may effect removal." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 135 (2d Cir. 2008).  The test requires SIG Sauer to "(1) show that it is a person within the meaning of the statute who acted under a federal officer, (2) show that it performed the actions for which it is being sued under color of federal office, and (3) raise a colorable federal defense." *Connecticut v. Exxon Mobil Corp.*, 83 F.4th 122, 142-43 (2d Cir. 2023).  "The first two of these prongs tend to collapse into a single requirement: that the *acts that form the basis for the state civil ... suit* were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations." *Connecticut*, 86 F.4th at 143 (quoting *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 488 F.3d 112, 124 (2d Cir. 2007) ("*In re MTBE*") (emphasis added in *Connecticut*) (internal quotation marks omitted)).  "The line between the absence and the presence of

7

'direct control' by a federal officer over a private party is a fine one, depending heavily on the facts of each case and the particular conduct giving rise to the plaintiff's cause of action." *Id.* at 125.

SIG Sauer argues that its case for removal is straightforward, as it is allegedly manufacturing machine guns for the United States military, under military contracts and pursuant to detailed specifications provided by the military. Plaintiffs contend that SIG Sauer's actions lack the required causal nexus with a federal officer, arguing that the government's instructions were not sufficiently comprehensive or detailed to satisfy the test for federal officer removal. *See id.* Plaintiffs also submit that the alleged misappropriations took place prior to the issuance of any detailed requirements by a federal officer.

Applying the Second Circuit's three-part test, the Court finds that SIG Sauer is a person acting under a federal officer within the meaning of the statute, thus satisfying the first factor. *See Isaacson*, 517 F.3d at 136-37 (concluding that the term "person" includes corporate persons, and that Defendants were "acting under" a federal officer where they "contracted with the Government to provide a product that the Government was using during war — a product that, in the absence of Defendants, the Government would have had to produce itself"). The second

prong of the test "has come to be known as the causation
requirement." *Id.* at 137; *see also Connecticut*, 83 F.4th at 145
(requiring a "causal nexus" between a party's role as a military
supplier and its allegedly unfair trade practices). "The hurdle
erected by this requirement is quite low." *Isaacson*, 517 F.3d
at 137. When determining whether a causal connection exists,
the court must credit SIG Sauer's theory of the case. *Id.*

Plaintiffs argue that there is no causation because there
were no "direct orders or ... comprehensive and detailed
regulations" requiring SIG Sauer to misappropriate or use their
trade secrets. *Connecticut*, 86 F.4th at 143 (citation omitted).
Plaintiffs contend in part that SIG Sauer's misappropriations
began as early as 2014, well before the government issued its
detailed requirements. SIG Sauer attests that its actions were
spurred by the government's requests, beginning with the SSN in
2017. ECF No. 1 at 16, ¶¶ 56, 59. Further factual development
will help determine when, and if, the government's interest in
such a weapon gave rise to the alleged misappropriation.

With regard to the government's precise specifications, the
parties offer different interpretations. While Plaintiffs claim
that the government's requests did not require the use of
allegedly-secret technologies, SIG Sauer submits that the
requests were highly detailed insofar as they specified weapon
length, weight, dispersion, fire control, rate of fire, and

controllability.  Relevant to the question of recoil impulse
technology, the military's final Request for Proposals ("RFP"),
issued in September 2021, allegedly included a specific
requirement to mitigate recoil.  The government also reportedly
provided a "Product Improvement Purchase Description" that
specified a maximum recoil energy and required that the guns be
tested for recoil energy and kinematics.

The Second Circuit has held that non-governmental corporate
entities satisfy the second prong when they show that "the acts
for which they are being sued ... occurred *because of* what they
were asked to do by the Government."  *Isaacson*, 517 F.3d at 137.
Here, there is little question that SIG Sauer ultimately
provided a specific type of weapon at the request of the
government.  Moreover, accepting SIG Sauer's theory of the case,
the weapon requested by the government invited, both implicitly
and explicitly, the use of recoil mitigating technology in a
form that met the size and weight restrictions imposed by its
specifications.  Plaintiffs allege that SIG Sauer met those
specifications by misappropriating its technology.  Again, a
more complete factual record will add to this analysis.  For
present purposes, the Court finds that SIG Sauer has satisfied
the causation element of the test for federal officer removal.

"Finally, Defendant[] must raise a colorable federal
defense."  *Id.* at 138.  "Courts have imposed few limitations on

what qualifies as a colorable federal defense." *Id.* "To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court." *Id.* (quoting *Willingham v. Morgan*, 395 U.S. 402, 407 (1969)). When reviewing a proposed federal defense, the Court is mindful that "[t]he inquiry on [a] motion to remand is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, [or] pre-discovery, to determine the threshold jurisdictional issue." *Coumo v. Crane Co.*, 771 F.3d 113, 116 (2d Cir. 2014); *see also, e.g., Jones v. Goodrich Pump & Engine Control Sys., Inc.*, 86 F.4th 1010, 1019 (2d Cir. 2023) ("whether and how [the federal defense] applies is a fact-specific question that we will leave for development in the district court on remand"). The Court also acknowledges that "when determining whether jurisdiction is proper, [it looks] only to the jurisdictional facts alleged in the Notice of Removal." *Agyin*, 986 F.3d 168 at 181.

SIG Sauer reportedly plans to advance a federal contractor defense. The federal contractor defense has been most notably applied in design defect cases. *See, e.g., Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988); *Badilla v. Midwest Air Traffic Control Serv., Inc.*, 8 F.4th 105, 121–22 (2d Cir. 2021). Under *Boyle*, "[l]iability for design defects in military

11

equipment cannot be imposed, pursuant to state law ... 'when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment.'" *Badilla*, 8 F.4th at 121–22 (quoting *Boyle*, 487 U.S. at 512). The Second Circuit has characterized the military contractor defense "stripped to its essentials" as "'[t]he Government made me do it.'" *In re Joint E. & S. Dist. New York Asbestos Litig.*, 897 F.2d 626, 632 (2d Cir. 1990).

SIG Sauer's assertion of the federal contractor defense is broadly supported by Circuit Court case law, as when the Fifth Circuit reasoned that "the government procurement officer did not order a quantity of restraint systems in the same way he would order light bulbs, but rather, government engineers approved the inclusion of these specific components into a complex piece of equipment." *Kerstetter v. Pac. Sci. Co.*, 210 F.3d 431, 437 (5th Cir. 2000). SIG Sauer also cites *Badilla*, in which the Second Circuit noted that "under *Boyle*, for the military contractor defense to apply, government officials must ultimately remain the agents of decision," 8 F.4th at 122, and that "*Boyle* hinges the military contractor defense upon the military contractor's having followed a government-approved requirement," *id.* at 126. SIG Sauer contends that it followed

such requirements and is therefore entitled to assert the defense.

Plaintiffs' objections to the federal contractor defense are primarily factual. Once again, they argue that SIG Sauer stole and incorporated their trade secrets, which at the time were GD-OTS trade secrets, before there were any government requirements in place. They also submit that the violation of state law was not mandated by the government's specifications. As noted above, courts do not favor addressing fact-specific questions when determining the threshold question of jurisdiction. *See, e.g., Jones*, 86 F.4th at 1019.

Plaintiffs also raise a legal objection: that SIG Sauer has not cited any Second Circuit case law to support the notion that the federal contractor defense applies to trade misappropriation cases. To succeed on the question of removal, however, SIG Sauer's assertion of the defense need only be "colorable." *Isaacson*, 517 F.3d at 138. Without expressing any opinion on the ultimate merits of the federal contractor defense, the Court finds that the defense "colorably" fits the facts of this case, and that SIG Sauer has met its modest burden. *See, e.g., In re Agent Orange*, 517 F.3d 76, 89-90 (2d Cir. 2008) ("The government contractor defense protects ... the government's discretionary authority over areas of significant federal interest such as military procurement.").

13

SIG Sauer's final argument is that Plaintiffs may have been required to share their trade secrets with the government, thereby erasing any state law protections.  SIG Sauer specifically cites the Defense Federal Acquisition Regulation Supplement, which requires contractors to provide the government with "unlimited rights" to use, modify, or release technical data for any purpose.  48 C.F.R. § 252.227-7013(a)(16). Plaintiffs again object, arguing that SIG Sauer provides no evidence that it shared trade secrets with the government, that any further disclosure by the government would violate federal law, and that the argument is therefore speculative.  "[W]here a plaintiff challenges the factual sufficiency of a defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state court.'" *Cuomo*, 771 F.3d at 116 (quoting *Willingham*, 395 U.S. at 409). The motion to remand to state court is therefore denied.

## II.  Motion to Dismiss

SIG Sauer has moved to dismiss the Complaint, arguing lack of standing, lack of personal jurisdiction, improper venue, and failure to state a claim.  The Court addresses each argument in turn.

### A.  Standing

SIG Sauer first moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), claiming lack of Article III

standing.  SIG Sauer contends that the Complaint fails to plausibly allege that Plaintiffs own the alleged trade secrets, or that the technology itself constitutes a trade secret. Plaintiffs respond that the VTSA does not require ownership, and that mere lawful possession of the trade secret is sufficient for standing.

To have standing, a plaintiff must establish "an injury in fact, defined as an invasion of a legally protected interest." *Citizens United to Protect Our Neighborhoods v. Vill. of Chestnut Ridge, New York*, 98 F.4th 386, 391 (2d Cir. 2024) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  Where, as here, a Rule 12(b)(1) motion is based on a facial challenge to the complaint, a court must "determine whether, accepting as true all material factual allegations of the complaint, and drawing all reasonable inferences in favor of the plaintiff[ ], the complaint alleges facts that affirmatively and plausibly suggest that the plaintiff[ ] [has] standing to sue." *New York v. Yellen*, 15 F.4th 569, 575 (2d Cir. 2021) (citation omitted).  In determining whether a plaintiff has standing to sue, a court "need not credit 'a legal conclusion couched as a factual allegation' or a 'naked assertion devoid of further factual enhancement.'" *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 75 (2d Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

15

The Complaint first alleges that in 2021, GD-OTS entered into a Teaming Agreement with Plaintiffs whereby Plaintiffs received LMMG Technical Data and Marketing Materials.  ECF No. 10 at 10, ¶ 38.  Since that time, Plaintiffs have allegedly taken reasonable measures to maintain the confidentiality of that data and those materials.  *Id.*  In a subsequent allegation, the Complaint claims more specifically that "Plaintiffs own, possess[], and utilize certain confidential, proprietary, and trade secret information, including owning by assignment and transfer from GD-OTS, the trade secrets related to the design and development of the GD-OTS LMMG, and SRIA technology as described above."  *Id.* at 15, ¶ 62.

Plaintiffs note that nothing in the VTSA explicitly requires ownership of a trade secret.  *See* 9 V.S.A. § 4601(2)(A) (defining "misappropriation" as "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means").  Moreover, "[t]he Second Circuit has consistently held ... that possession of a trade secret is sufficient to confer standing on a party for a claim of trade secret misappropriation."  *Faiveley Transp. USA, Inc. v. Wabtec Corp.*, 758 F. Supp. 2d 211, 220 (S.D.N.Y. 2010) (citing *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir. 1999)).  Here, the Complaint alleges both ownership and possession of the trade secrets related to the LMMG and SRIA.

16

While SIG Sauer seeks to disprove the allegations in the Complaint by referencing certain patent assignments between GD-OTS and Lone Star, those assignments do not necessarily rule out the transfer of confidential trade secrets, as such secrets would most likely not be referenced in a public patent filing. Drawing all reasonable inferences in favor of the Plaintiffs, the Court finds that they have plausibly demonstrated standing to bring a misappropriation claim under the VTSA.

### B.    Personal Jurisdiction

SIG Sauer next moves to dismiss for lack of personal jurisdiction. The Complaint alleges that the trade secrets held by GD-OTS were developed in Vermont, that SIG Sauer actively recruited both current and past Vermont employees of GD-OTS, and that GD-OTS suffered harm in Vermont when those employees helped to misappropriate its trade secrets. SIG Sauer argues that these allegations fall short of establishing personal jurisdiction, in part because a New Hampshire company (SIG Sauer) hiring persons who live or lived in Vermont is insufficient. SIG Sauer also contests the assertion that GD-OTS was harmed in Vermont, as GD-OTS is a Virginia company with a corporate headquarters in Florida.

"A plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Troma Ent., Inc. v. Centennial Pictures, Inc.*, 729

F.3d 215, 217 (2d Cir. 2013) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010)).  When the issue of personal jurisdiction is "decided initially on the pleadings and without discovery, the plaintiff need show only a *prima facie* case" of jurisdiction.  *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984).  A *prima facie* showing "must include an averment of facts that, if credited ... would suffice to establish jurisdiction over the defendant."  *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996) (alteration in original) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  "In evaluating whether the requisite showing has been made, [the court] construe[s] the pleadings and any supporting materials in the light most favorable to the plaintiffs."  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013).

"In the absence of a federal statute specifically directing otherwise, and subject to limitations imposed by the United States Constitution, [the court] look[s] to the law of the forum state to determine whether a federal district court has personal jurisdiction."  *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2016).  In Vermont, a court may exercise personal jurisdiction over a non-resident defendant "to the full extent permitted by the ... Due Process Clause" of the Fourteenth

Amendment. *State v. Atl. Richfield Co.*, 2016 VT 22, ¶ 10
(internal quotation marks omitted); *see also In re Roman
Catholic Diocese of Albany, N.Y., Inc.*, 745 F.3d 30, 38 (2d Cir.
2014). To establish personal jurisdiction over a defendant, due
process requires a plaintiff to allege (1) that the defendant
has "certain minimum contacts" with the relevant forum, and (2)
that the exercise of jurisdiction is reasonable in the
circumstances. *In re Terrorist Attacks on Sept. 11, 2001*, 714
F.3d 659, 673 (2d Cir. 2013) (quoting *Int'l Shoe Co. v.
Washington*, 326 U.S. 310, 316 (1945)).

When determining whether a defendant has the necessary
"minimum contacts," a distinction is made between "specific" and
"general" personal jurisdiction. *Metro. Life Ins. Co.*, 84 F.3d
at 567–68. General jurisdiction may only be asserted "when the
corporation's affiliations with the State in which suit is
brought are so constant and pervasive as to render [it]
essentially at home in the forum State." *Daimler AG v. Bauman*,
571 U.S. 117, 122 (2014). Corporations are generally considered
as "at home" in the states where they are incorporated or where
they maintain their principal place of business. *Id.* at 137.
SIG Sauer is not incorporated or based in Vermont, and its
alleged contacts do not appear to be so constant or pervasive as
to render it "essentially at home" in Vermont. *Id.* at 122.

Plaintiffs' counsel conceded at oral argument that Plaintiffs are not arguing for the assertion of general jurisdiction.

Specific personal jurisdiction is implicated when "the claim arises out of, or relates to, the defendant's contacts with the forum" such that it can be said to have "'purposefully availed' itself of the privilege of doing business in the forum and could foresee being 'haled into court' there." *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 152 (2d Cir. 2001) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).  Plaintiffs "must show that the defendant deliberately 'reached out beyond' its home — by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship centered there." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)).

The Complaint alleges that SIG Sauer "aggressively recruit[ed] key GD-OTS employees who had spent years designing and developing" SRIA and LMMG trade secrets in Vermont, thereby "obtaining crucial and highly confidential design data."  ECF No. 10 at 3, ¶ 13.  Specifically, in 2014 SIG Sauer hired "David Steimke, a key GD-OTS engineer.  For 19 years, Mr. Steimke was a Senior Principal Design Engineer at the GD-OTS facility in Vermont," serving as "lead engineer, technical product lead, and original designer on the LMMG project."  *Id.* at 11, ¶ 41.

Plaintiffs allege that, with Mr. Steimke's help, SIG Sauer "was able to design and manufacture a competing .338 NM belt-fed machine gun in less than eighteen months when it took GD-OTS more than a decade to develop and mature its impulse averaging and LMMG technology." *Id.* at 14, ¶ 51.

In 2013, prior to hiring Mr. Steimke, SIG Sauer hired GD-OTS employee Jason Knight. *Id.* at 11, ¶ 43. Mr. Knight was a Principal Project Engineer and Design Engineer, worked on the LMMG project in Vermont, and allegedly had access to the technical data and marketing materials that contained and/or constituted trade secrets. *Id.* In 2017, SIG Sauer hired Paul Snyder. *Id.*, ¶ 44. Mr. Snyder worked for GD-OTS for over 12 years, "was part of GD-OTS's LMMG project," and had access to the relevant technical data and marketing materials. *Id.* at 11-12, ¶ 44. The Complaint alleges that "SIG [Sauer] has continued to attempt to hire former GD-OTS employees who now work for Plaintiffs," including "a high-level engineer working on the LMMG project for Plaintiff three times in the last two years, even offering to allow that engineer to work remotely from Vermont." *Id.* at 12, ¶ 45.

Accepting these allegations as true, SIG Sauer reached out to current or former GT-ODS employees in Vermont to access trade secrets that were developed here after years of research and development. Once it accessed those secrets, and after the

21

government announced in 2017 that it would be seeking manufacturers to provide certain belt-fed medium machine guns, SIG Sauer began developing those products in competition with GD-OTS.  The Complaint alleges that "[a]s configured, SIG could not offer these weapons but for the use of Plaintiffs' trade secrets."  *Id.* at 14, ¶ 53.

SIG Sauer argues that the factual timeline alleged in the Complaint does not line up with the misappropriation claim.  It submits that the hiring of Mr. Seimke, for example, predated the government's 2017 SSN (in which the government first formally expressed interest in the desired weapons) by approximately three years, and that Mr. Seimke did not work on machine guns until that time.  SIG Sauer also submits that prior to being hired by SIG Sauer, Mr. Seimke had been demoted by GD-OTS and was looking for a new job, while Mr. Knight and Mr. Snyder had been laid off.

The Second Circuit has long held that where the court chooses not to conduct a full-blown evidentiary hearing on a motion to dismiss for lack of personal jurisdiction, "a *prima facie* showing suffices, notwithstanding any controverting presentation by the moving party, to defeat the motion."  *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981); *see also MDG Real Est. Glob. Ltd. v. Berkshire Place Assocs., LP*, 513 F. Supp. 3d 301, 305 (E.D.N.Y. 2021) ("at this stage,

the Court may evaluate only the plaintiffs' submissions"). Viewing the allegations in the Complaint in a light most favorable to the Plaintiffs, SIG Sauer aggressively and successfully recruited GD-OTS employees from Vermont in order to obtain certain trade secrets. Those trade secrets were developed by GD-OTS at its Vermont facility and were misappropriated for the purpose of competing with GD-OTS. Those recruitments efforts are ongoing, and at least one offer was made that would allow an LMMG project employee to work for SIG Sauer from Vermont. These contacts with Vermont were not "random, fortuitous, or attenuated," and were instead intended to solicit employees and obtain valuable information from a Vermont-based employer. *Mylan Techs., Inc. Zydue Noveltech, Inc.*, No. S0041-09CNC 2012 WL 609864 (Vt. Super. Feb. 15, 2012). The Court finds that these allegations are sufficient to satisfy Plaintiffs' *prima facie* burden. *See id.* (citing *Nucor Corp. v. Bell*, 482 F. Supp. 2d 714, 722-23 (D.S.C. 2007) (finding specific jurisdiction where defendant intentionally and specifically directed communications into South Carolina for the purpose of enticing employees of a South Carolina company to misappropriate trade secrets); *Innovative Therapies, Inc. v. Kinetic Concepts, Inc.*, 328 S.W.3d 545, 554 (Tex. App. 2010) (finding specific jurisdiction where Maryland company contacted, recruited, and compensated a Texas engineer at a competing Texas

23

corporation for his skill and knowledge in order to improve the Maryland corporation's prototype device)).

After considering minimum contacts, a court must undertake the second part of the jurisdictional analysis: "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice' — that is, whether it is reasonable under the circumstances of the particular case." *Metro. Life Ins. Co.*, 84 F.3d at 568 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Courts consider five factors in evaluating reasonableness: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Id.* (citing *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113–14 (1987), and *Burger King*, 471 U.S. at 476–77).

If a plaintiff satisfies the threshold showing of minimum contacts required for the first part of the test, a defendant must present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Metro. Life Ins. Co.*, 84 F.3d at 568 (quoting *Burger King*, 471 U.S. at

477).  The import of the 'reasonableness' inquiry varies
inversely with the strength of the 'minimum contacts' showing —
a strong (or weak) showing by the plaintiff on 'minimum
contacts' reduces (or increases) the weight given to
'reasonableness.'"  *Bank Brussels Lambert v. Fiddler Gonzalez &
Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (citations omitted).

With regard to the first factor in the analysis, the burden
on a New Hampshire company to litigate in Vermont will be
minimal given the geographic proximity of the two states.  The
second factor – the interests of the forum state in adjudicating
the case – weighs in Plaintiffs' favor.  SIG Sauer allegedly
reached into Vermont with the intention of misappropriating
trade secrets that were developed here.  Vermont law protects
against such misappropriation, and the state has a strong
interest in upholding that law.  *See, e.g., Real Good Toys, Inc.
v. XL Mach. Ltd.*, 163 F. Supp. 2d 421, 425 (D. Vt. 2001)
("Vermont has an important interest in protecting its citizens'
intellectual property rights and business interests.").

"The third and fourth factors both implicate the ease of
access to evidence and the convenience of witnesses."  *Bank
Brussels Lambert*, 305 F.3d at 130.  Much of the evidence in this
case will be in New Hampshire and Texas.  Evidence relating to
the development of the technology at issue, however, will most
likely center on activities at the GD-OTS facility in Vermont.

25

Plaintiffs concede that the third factor, regarding their
interest in obtaining convenient and effective relief, weighs
slightly against them.  ECF No. 18 at 14.  SIG Sauer's briefing
does not address the fourth factor – regarding the interests of
the interstate judicial system – while Plaintiffs submit that
those interests will be served by efficient resolution in the
jurisdiction where the trade secrets were developed.  The Court
finds that the third and fourth factors, considered together, do
not favor either party.

SIG Sauer also does not address the fifth factor, which
considers fundamental social policies.  Plaintiffs contend that
asserting personal jurisdiction over SIG Sauer "does not appear
likely to erode" any such policies, and the Court agrees.  *Id.*
at 15.  On balance, the Court finds that the five-factor test
weighs in favor of Plaintiffs' contention that personal
jurisdiction in Vermont is reasonable, and that SIG Sauer has
not presented "a compelling case" to the contrary.  *Metro. Life
Ins. Co.*, 84 F.3d at 568.

The matter of personal jurisdiction presents a close
question, particularly given the parties' geographic locations.
Ultimately, resolution of the issue may depend upon facts
revealed in the course of discovery.  *See A.I. Trade Fin., Inc.
v. Petra Bank*, 989 F.2d 76, 79 (2d Cir. 1993) ("Eventually
personal jurisdiction must be established by a preponderance of

26

the evidence, either at an evidentiary hearing or at trial."). At the motion to dismiss stage, however, and absent an evidentiary presentation by the parties, the Court finds that Plaintiffs have made the required *prima facie* showing.  The motion to dismiss for lack of personal jurisdiction is therefore denied.

### C.    Venue

Under 28 U.S.C. § 1391(b), a civil action may be brought in

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred ...; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

Generally, the "assessment of venue merges into the personal jurisdiction analysis, and thus venue is proper anywhere there is personal jurisdiction." *Real Good Toys*, 163 F. Supp. 2d at 425-26.  The Court also notes that "[t]he gravamen of a complaint for misappropriation is the wrongful taking of a trade secret," and in this case the "taking" arguably took place in Vermont with the recruitment of GD-OTS employees. *Universal Marine Med. Supply, Inc. v. Lovecchio*, 8 F. Supp. 2d 214, 220 (E.D.N.Y. 1998).  Venue is therefore proper in this District.

**D.    Failure to State a Claim**

Finally, SIG Sauer moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiffs have failed to plead with adequate detail either the existence of protectable trade secrets or a misappropriation.  To survive a motion to dismiss brought under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 566 U.S. at 678.  The factual allegations "must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 (complaint must raise "more than a sheer possibility that a defendant has acted unlawfully").

SIG Sauer first argues that Plaintiffs have failed to identify protectable trade secrets.  The VTSA defines a "trade secret as

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (A) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other person who can obtain economic value from its disclosure or use; and (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

28

9 V.S.A. § 4601(3). While the Complaint offers allegations that satisfy this definition, the parties dispute whether those allegations are sufficiently specific to survive the motion to dismiss.

"[D]istrict courts in this circuit routinely require that plaintiffs plead their trade secrets with sufficient specificity to inform the defendants of what they are alleged to have misappropriated." *Zabit v. Brandometry, LLC*, 540 F. Supp. 3d 412, 422 (S.D.N.Y. 2021) (citation omitted). Nonetheless, "specificity as to the *precise* trade secrets misappropriated is not required" to defeat a motion to dismiss. *Medtech Prods., Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 789 (S.D.N.Y. 2008) (citation omitted) (emphasis supplied). At the pleading stage, "a plaintiff only need give the opposing party fair notice of what the plaintiff's claim is and the grounds on which it rests." *Ritani, LLC v. Aghjayan*, 880 F. Supp. 2d 425, 440 (S.D.N.Y. 2012).

In this case, the Complaint alleges that the trade secrets at issue relate to the SRIA technology and the use of that technology in the .338 caliber LMMG. Those secrets are allegedly found in "technical data and marketing materials including technical data packages, specifications, technical information, designs, drawings, and manufacturing, assembly,

testing procedures and testing results." ECF No. 10 at 3, ¶ 10.
The Complaint claims that Plaintiffs and GD-OTS took certain
measures to protect the secrecy of those materials, including
limiting access to the information by storing it on secure
servers. *Id* at 9, ¶ 35. The Complaint further explains the
contours of the alleged trade secrets, describing them as
"negative know-how" about certain machine gun components,
"specific trade secrets related to application of SRIA
technology to a machine gun chambered in .338," and financial
information including "business plans and methods, marketing
information, cost estimates, forecasts, financial data, bid and
proposal information, customer identification, and sources of
supply." *Id.* at 9, ¶¶ 32-34.

　　　The Court finds that these allegations give SIG Sauer fair
notice of the trade secrets it allegedly misappropriated. *See
e.g. Sorias v. Nat'l Cellular USA, Inc.*, 124 F. Supp. 3d 244,
259 (E.D.N.Y. 2015) (holding that generally categorizing trade
secrets as "data and designs of a specific phone charger with
horizontally folding A/C prongs designed by [plaintiff]" was
sufficient, and that "[f]urther specificity ... is not
required"). The focus of the technology at issue is the SRIA,
particularly as applied to a lighter-weight machine gun. SIG
Sauer knows of the technology, knows that it hired former GD-OTS
employees who worked with that technology, and has sufficient

information from the Complaint to be put on fair notice about
what secrets it is claimed to have misappropriated.

In addition to sufficiency of detail, SIG Sauer contests
whether the information in question is in fact a trade secret.
For example, SIG Sauer challenges the Complaint's assertion that
the SRIA technology is "revolutionary."  ECF No. 5 at 23.  For
support, SIG Sauer cites evidence beyond the pleadings, which
the Court will not consider in the context of a Rule 12(b)(6)
motion.  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d
42, 47 (2d Cir. 1991).  SIG Sauer also argues that the alleged
trade secrets are set forth in public patents and are therefore
no longer secret.  This too presents a factual question, as the
content of the patents is not alleged in the Complaint and
Plaintiffs plausibly allege receiving non-public trade secrets.

SIG Sauer also argues that the Complaint fails to
adequately claim misappropriation.  Specifically, SIG Sauer
contends that the Complaint fails to sufficiently allege that
its technology is the same as that developed by GD-OTS, or that
its product used the GD-OTS technology.  The Complaint claims
that its employees witnessed a demonstration of the SIG Sauer
product at an event in Nevada and "noted that it appeared to
utilize the substantially same SRIA technology developed at GD-
OTS."  ECF No. 10 at 13, ¶ 49.  Plaintiffs knew that SIG Sauer
employed former GD-OTS employees, at least one of whom worked

directly with the SRIA technology.  Until that time, SIG Sauer
had never developed a competing belt-fed weapon.  With respect
to misappropriation, the Complaint alleges that SIG Sauer
obtained confidential knowledge from former GD-OTS employees and
obtained GD-OTS written materials containing protected
information.

In response to the motion to dismiss, Plaintiffs submit
that not only are these allegations sufficient, but also that
they need not show the misappropriated information was
physically incorporated into the SIG Sauer product.  *See
GlobeRanger Corp. v. Software AG United States of Am., Inc.*, 836
F.3d 477, 492 (5th Cir. 2016) (reasoning that "use" of a trade
secret may include assistance with or acceleration of research
and development).  The Vermont Supreme Court has not spoken on
that precise issue.  The Court nonetheless finds that under the
Rule 12(b)(6) standard, accepting Plaintiffs' allegations as
true and making all reasonable inferences in their favor, they
have plausibly alleged that SIG Sauer misappropriated trade
secrets.  *See, e.g., Medtech Prods. Inc.*, 596 F. Supp. 2d at 789
(finding that plaintiff stated a claim for trade secret
misappropriation where the complaint alleged that two former
employees with "extensive knowledge of [plaintiff's] business
and production process" disclosed that confidential information
to the defendant, which was able to bring a similar product to

market"). While factual issues remain to be resolved, Plaintiffs' claims are sufficient to survive the motion to dismiss for failure to state a claim. The motion to dismiss is therefore denied.

## Conclusion

For the reasons set forth above, the pending motion to dismiss (ECF No. 5) and motion to remand (ECF No. 16) are **denied.**

DATED at Burlington, in the District of Vermont, this 25th day of October, 2024.

/s/ William K. Sessions III
William K. Sessions III
U.S. District Court Judge